1
2
3                    **UNITED STATES DISTRICT COURT**
                        **DISTRICT OF NEVADA**
4                          **RENO, NEVADA**
5
In re: HORACE B. SUTER, JR.,  )    3:04-CV-00325-ECR-RAM
6  BARBARA J. SUTER,             )
                                 )
7       Appellants,              )    **ORDER**
                                 )
8  vs.                           )
                                 )
9  WARREN GOEDERT, ERICA         )
   MICHAELS HOLANDER, and        )
10 BRUCE MATLEY,                  )
                                 )
11      Appellees.               )
                                 )
12 _____)

13      This case comes to us on remand from the Ninth Circuit.  In

14 light of the long and complex history of the case, the Court held a

15 hearing on September 29, 2008.  We heard oral argument from both

16 sides, and judgment was entered (#55) on the same day.  We now set

17 forth in detail our analysis of the case, which was the basis for

18 the entry of judgment.

19      We must determine whether the defendants in a pre-petition

20 legal malpractice lawsuit may purchase that lawsuit from a trustee

21 in bankruptcy when the plaintiffs file for bankruptcy protection.

22 We conclude that they may.

23

24                          **I. Background**

25      Appellants Horace and Barbara Suter ("the Suters")

26 institutionalized their daughter during her teenage years in the

27 Truckee Meadows Hospital and Rehabilitation Center.  The Suters

28 believed their daughter was improperly treated during her stay at

   the facility and retained the law firm of Goedert & Michaels ("the

1  Goedert firm," or "the defendants") to file suit against the
2  institution and the attending physicians.

3       While at the rehabilitation center, the Suters' daughter's
4  treating physician was a Dr. Tannenbaum.  Tannenbaum allegedly used
5  "Blow Hole Therapy" as a method of treatment, which consisted of
6  removing a patient's undergarments and blowing puffs of air into
7  the patient's rectal area.  At the time of the lawsuit against the
8  physicians, the Suters did not know that this treatment technique
9  was used on their daughter.  Further, the Goedert firm did not
10 depose Dr. Howle, the chief of staff of the hospital, or find out
11 about the treatment during discovery.

12      Unbeknownst to the Suters, their attorney, Defendant Bruce
13 Matley, was a patient of Howle.  Matley did not disclose this to
14 the Suters.  Matley did, however, send a thank-you letter to Howle
15 around the time the litigation started, which expressed his
16 gratitude for Howle's services and informed Howle that he could no
17 longer be Howle's patient.

18      The Suters settled their lawsuit with the institution, but
19 continued on with their case against the individual physicians to
20 trial.  The attending physicians asserted counterclaims against the
21 Suters.  The physicians were successful with their counterclaims
22 and obtained a state court award of approximately $200,000 at
23 trial.[1]

24      After losing on their counterclaims, the Suters learned of
25 Matley's relationship with Howle and commenced a malpractice action
26 against the firm.  On a motion for summary judgment, the state

27 _____

28      [1]The exact amount of the award is $202,486 and appears to be for
   legal fees.  (Bankr. Ct. Hearing Trans. April 14, 2004, at 9.)

2

court found in favor of the Goedert firm.  The Suters filed a motion for reconsideration, which was denied.  The Suters then appealed the decision to the Nevada Supreme Court.

While the appeal to the Nevada Supreme Court was pending, the Suters filed for Chapter 7 bankruptcy protection on September 19, 2003, in light of the judgment against them.  Their counsel informed them that they would not lose their cause of action against the Goedert firm if they filed for bankruptcy protection. The Suters listed the malpractice action as an asset on their bankruptcy schedules, but they did not claim an exemption for it.

Counsel for the Goedert firm learned of the bankruptcy proceeding, contacted the Trustee in Bankruptcy, Ms. Angelique Clark, and offered to pay $10,000 to settle the lawsuit.  The Suters learned of the offer to the trustee and borrowed $10,000 from one of Barbara Suter's parents.  (Bankr. Ct. Hearing Trans. April 14, 2004, at 20.)  The Suters then offered to buy back the lawsuit asset from the trustee for $10,000.  The trustee agreed to compromise the claim with the Suters, subject to the approval of the bankruptcy court, for "ten thousand dollars or for such other greater amount that may be offered" at a hearing on the matter. (Id. at 14.)  On February 18, 2004, the trustee filed a Motion Authorizing the Release of the Estate's Interest in a Personal Litigation Suit with the bankruptcy court.  A hearing for the motion was set for April 14, 2004.[2]

---

[2]The Suters argue that their offer was a "compromise" and not a sale, the difference being that the Suters were not purchasing the asset free and clear from the trustee.  Rather, they were purchasing whatever rights they had in the lawsuit from the trustee. Technically, a "compromise" is "an agreement arrived at . . . for settling a dispute upon what appears to the parties to be equitable

3

1    At the April 14 hearing, representatives for the Goedert firm
2 were also present.  The firm offered the trustee $11,000 for the
3 malpractice cause of action.  The lawyers in the firm, of course,
4 were also the defendants in the lawsuit.  By settling the lawsuit,
5 the Goedert firm would not need to worry about any potential future
6 judgment.  The Suters offered to match the $11,000 offer, even
7 though they had made arrangements to borrow only $10,000.  The
8 Goedert firm then offered $15,000 for the lawsuit, or $12,500 in
9 the event the Suters appealed the Goedert's purchase.

10    Faced with two offers, the trustee opted to accept the Goedert
11 firm's offer, determining that the Goedert offer was in the best
12 interest of the estate's creditors.  The Suters' attorney for their
13 malpractice action alleges that he was never contacted by the
14 trustee to determine the potential value of the underlying suit,
15 which the attorney put at in excess of $1 million.  Regardless, the
16 bankruptcy court entered an order accepting the transfer of the
17 Suters' lawsuit to the Goedert firm on May 14, 2004.[3]

18    Once the Goedert firm gained control of the lawsuit, the firm
19 and the trustee executed a stipulation on May 19, 2004, in which
20 the trustee agreed to dismiss the appeal pending before the Nevada
21 Supreme Court.  On May 24, 2004, the Suters filed a notice of
22 appeal regarding the order granting the release of the suit with

23

24 terms, having regard to the uncertainty they are in regarding the
25 facts, or the law and the facts together."   359 BLACK'S LAW DICTIONARY
   (Rev. 4th ed. 1968).  For present purposes, the distinction really
26 only matters to the extent that the lawsuit was or was not property
   of the bankruptcy estate.

27    [3]The agreement specifically provides that it encompasses only
28 Horace and Barbara Suters' claims; their daughter's claims against the
   physicians are not affected by the sale or compromise.

4

the bankruptcy court.  On May 25, 2004, the Suters filed a motion for stay pending appeal.  The Nevada Supreme Court granted the Goedert and trustee stipulation and dismissed the appeal on June 9, 2004.  On June 14, 2004, the Goedert firm filed its response to the motion to stay before the bankruptcy court, arguing that the motion was moot in light of the Nevada Supreme Court's dismissal.  On July 26, 2004, the bankruptcy court denied the motion for stay pending appeal, reasoning that the stay was moot in light of the Supreme Court's dismissal.  Alternatively, the bankruptcy court determined that the trustee acted in accordance with the best interest of the estate and the estate's creditors.

    The bankruptcy court's decision was appealed to this Court, and we dismissed the appeal on the basis of mootness.  That decision was appealed to the Ninth Circuit, which reversed.  The Ninth Circuit concluded that the Suters could revive their appeal before the Nevada Supreme Court by filing a motion for an extraordinary writ.  The Ninth Circuit then remanded the case to this Court to "hear the Suters' appeal on the merits."  Suter v. Goedert, 504 F.3d 982, 991 (9th Cir. 2007).

## II. Standard of Review

    We review the bankruptcy court's findings of fact under the "clearly erroneous" standard and its conclusions of law de novo. Global W. Dev. Corp. v. N. Orange County Credit Svc., Inc. (In re Global W. Dev. Corp.), 759 F.2d 724, 726 (9th Cir. 1985).  Whether an asset is property of the estate is reviewed de novo.  Cisneros v. Kim (In re Kim), 257 B.R. 680, 684 (9th Cir. B.A.P. 2000); see

1  Hanf v. Summers (In re Summers), 332 F.3d 1240, 1242 (9th Cir.
2  2003).

3       The bankruptcy court's decision to approve a compromise is
4  reviewed for an abuse of discretion.  Martin v. Kane (In re A&C
5  Props.), 784 F.2d 1377, 1380 (9th Cir. 1986).  Under an abuse of
6  discretion standard, this Court will not reverse the bankruptcy
7  court's decision unless we have a firm conviction that the court
8  "committed a clear error of judgment in the conclusion it reached
9  . . . ."  Marx v. Loral Corp., 87 F.3d 1049, 1054 (9th Cir. 1996).
10
11                        **III. Discussion**

12       Two issues need to be decided: (1) whether the legal
13  malpractice lawsuit was property of the estate; and (2) if so, did
14  the bankruptcy court abuse its discretion in confirming the sale or
15  compromise of the claim to the Goedert firm?

16

17       **A. Whether the Legal Malpractice Action Was Property of the**
18  **Estate**

19       When a bankruptcy petition is filed, an "estate" is created,
20  consisting of all of the debtor's interests, both legal and
21  equitable, in all property, both tangible and intangible.  11
22  U.S.C. § 541(a); Hillis Motors, Inc. v. Hawaii Auto. Dealers'
23  Ass'n, 997 F.2d 581, 585 (9th Cir. 1993); In re Burgess, 234 B.R.
24  793, 795-96 (D. Nev. 1999).  Thereafter, the property of the estate
25  is distinct from the property of the debtor.  Property acquired
26  post-petition by the debtor does not enter the estate; it remains
27  the separate property of the debtor.  See ALAN N. RESNICK & HENRY J.
28  SOMMER, 5 COLLIER ON BANKRUPTCY ¶ 541.03 (15th ed. 1996) (hereinafter

6

"COLLIER ON BANKRUPTCY") ("In general, property . . . subsequently acquired by the debtor does not become property of the estate, but rather, becomes the debtor's personal property, clear of all claims that are ultimately discharged in the bankruptcy case.") (footnotes omitted).  Although "property" is not defined in the Bankruptcy Code, it has been interpreted liberally in order to further the policies underlying the bankruptcy laws.  See United States v. Whiting Pools, Inc., 462 U.S. 198, 202-04, 204 (1983) ("The congressional goal of encouraging reorganizations . . . suggest[s] that Congress intended a broad range of property to be included in the estate.").

The Suters did not claim the legal malpractice action as an exemption on their schedules when they filed their bankruptcy petition.  Nevertheless, they argue that they could have exempted the action as a personal injury action.  Alternatively, the Suters contend that the cause of action should be excluded from the bankruptcy estate on public policy grounds.

**1. The Suters Listed the Malpractice Action on Their Bankruptcy Schedules**

When the Suters originally filed for bankruptcy protection, they listed the legal malpractice action as an asset of the bankruptcy estate.  This listing is at least some evidence that the Suters thought that the claim was property of the estate and no longer belonged to them personally.

Statements made in bankruptcy schedules are executed under penalty of perjury and, when offered against the debtor, "are eligible for treatment as [evidentiary] admissions."  In re Bohrer,

266 B.R. 200, 201 (Bankr. C.D. Cal. 2001).  The Suters contend, without authority, that listing the lawsuit in the schedules is only a prima facie indication that it is property of the estate, but it is not property of the estate for purposes of res judicata. (Appellant's Reply 2 (#51).)

Bankruptcy schedules may have preclusive effect if a court has relied on those schedules.  See Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778 (9th Cir. 2001).  In Hamilton, the district court for the Central District of California held that a debtor could not fail to include potential causes of action in his bankruptcy schedules and then later sue to recover on those claims after the conclusion of the bankruptcy proceedings.  Id. at 782.  The district court concluded that so doing constituted asserting contradictory positions and hence barred the debtor's subsequent claims under the doctrine of judicial estoppel.  Id.

On appeal, the Ninth Circuit affirmed.  The court first noted that judicial estoppel is limited to cases where one court has "relied on, or 'accepted,' the party's previous inconsistent position."  Id. at 783.  Next, the circuit continued that "[i]n the bankruptcy context, a party is judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements."  Id. Ultimately, the Ninth Circuit held that a debtor "is precluded from pursuing claims about which he had knowledge, but did not disclose, during his bankruptcy proceedings, and that a discharge of debt by a bankruptcy court, under these circumstances, is sufficient acceptance to provide a basis for judicial estoppel . . . ."  Id. at 784.  Thus, the listing of an asset on a bankruptcy schedule may

be given preclusive effect in some circumstances.  <u>See also</u>
<u>Superior Crewboats, Inc. v. Primary P&I Underwriters (In re</u>
<u>Superior Crewboats)</u>, 374 F.3d 330, 335-36 (5th Cir. 2004) (holding
that the debtors' failure to disclose a pre-petition personal
injury claim warranted applying judicial estoppel to prevent them
from subsequently pursuing the cause of action); <u>Barger v. City of</u>
<u>Cartersville</u>, 348 F.3d 1289, 1295-97 (11th Cir. 2003) (holding that
a debtor who failed to list her pending employment discrimination
suit as an asset in her bankruptcy schedules was judicially
estopped from asserting the claim).

Turning to the present case, by listing the legal malpractice
action on their bankruptcy schedules, the Suters, under oath,
acknowledged that the claim was property of the estate.  They did
not claim that it was not property of the estate, nor did they
claim that it was exempt from the estate.  That the Suters now
contend that the claim is not property of the estate does not
render their schedules nullities.  <u>See</u> <u>In re Bohrer</u>, 266 B.R. at
201 (stating that an original schedule is still "subject to
consideration by the court as an evidentiary admission" even after
an amended schedule has been filed).

**2. Legal Causes of Action are Property of the Estate**

The Suters argue that the malpractice action could be exempt
from the bankruptcy estate if it is classified as a personal injury
claim.  In general, causes of action existing at the time the
bankruptcy petition is filed are considered property of the estate.
<u>Sierra Switchboard Co. v. Westinghouse Elec. Corp. (In re Sierra</u>
<u>Switchboard)</u>, 789 F.2d 705, 707 (9th Cir. 1986) (citing <u>Whiting</u>

9

1   Pools, 462 U.S. at 205 & n.9).  This includes pre-petition tort

2   claims.  Id. (holding that a claim for emotional distress is an

3   asset of the bankruptcy estate); In re Richards, 57 B.R. 662, 665

4   (Bankr. D. Nev. 1986).[4]

---

6       [4]See also Kollar v. Miller, 176 F.3d 175, 178 (3d Cir. 1999)
    (property of the estate has "been interpreted broadly, and include[s]
7   an interest in a cause of action") (and citing Integrated Solutions,
    Inc. v. Serv. Support Specialties, Inc., 124 F.3d 487, 490 (3d Cir.
8   1997) ("The Bankruptcy Code defines a bankrupt's estate broadly to
    encompass all kinds of property, including intangibles and causes of
9   action")); Matter of Wischan, 77 F.3d 875, 877 (5th Cir. 1996)
    (finding the "debtors' pre-petition causes of action for personal
10  injuries are property of their estates"); In re Cottrell, 876 F.2d
    540, 543 (6th Cir. 1989) (concluding that the debtors' "personal
11  injury action was an asset of the bankruptcy estate"); Jones v.
    Harrell, 858 F.2d 667, 669 (11th Cir. 1988) ("A trustee in bankruptcy
12  succeeds to all causes of action held by the debtor at the time the
    bankruptcy petition is filed. . . .  This includes claims for personal
13  injuries") (internal citations omitted); Tignor v. Parkinson, 729 F.2d
    977, 981 (4th Cir. 1984) (finding personal injury claim to be property
14  of the estate); In re Cabral, 285 B.R. 563, 579 n.6 (B.A.P. 1st Cir.
    2002) ("property of the estate includes a debtor's claim for personal
15  injuries whether the claim is unliquidated or settled at the time of
    filing the bankruptcy petition.  A debtor's personal injury claim
16  remains the property of the bankruptcy estate unless it qualifies as
    an exemption under 11 U.S.C. § 522"); Lee v. Miller, 263 B.R. 757, 760
17  (S.D. Miss. 2001) (finding debtors' negligence and loss of consortium
    claims to be property of the estate); Neville v. Harris, 192 B.R. 825,
18  829-30 (D.N.J. 1996) ("the Lawsuit is a cause of action existing at
    the time the [debtors] filed the Petition and became property of the
19  Estate when the Petition was filed"); In re Cupp, 383 B.R. 84, 88
    (Bankr. E.D. Tenn. 2008) ("Personal injury claims arising from a
20  pre-petition automobile accident fall within the broad parameters of
    a debtor's bankruptcy estate, even when unliquidated at the time the
21  petition was filed"); In re MacDonald, 326 B.R. 6, 13 (Bankr. D. Mass.
    2005) (concluding that debtor's personal injury action was property
22  of the estate); In re Colombo, 325 B.R. 587, 594 (Bankr. N.D. Iowa
    2005) ("A personal injury claim arising pre-petition becomes property
23  of the estate in its entirety"); In re Hamlett, 304 B.R. 737, 740
    (Bankr. M.D.N.C. 2003) ("The estate created pursuant to § 541 includes
24  causes of action belonging to the debtor at the time the case is
    commenced, including causes of action or claims for personal or bodily
25  injury"); In re Mercury, 280 B.R. 35, 58 (Bankr. S.D.N.Y. 2002)
    ("There is no question that the [debtors'] pre-petition claims
26  asserted in the personal injury action constituted property of the
    debtors' estates under 11 U.S.C. § 541(a)(1)"); In re Clark, 274 B.R.
27  127, 132 (Bankr. W.D. Pa. 2002) ("Personal injury claims pending at
    the time of the filing of a bankruptcy case are property of the
28  estate"); In re Cooper, 263 B.R. 835, 837 (Bankr. S.D. Ohio 2001)
    ("Prepetition personal injury claims, as well as the settlement

1    Certain assets are exempted from property of the estate.  <u>See</u>

2  Nᴇᴠ. Rᴇᴠ. Sᴛᴀᴛ. § 21.090.  Nevada has opted out of using the federal

3  exemptions, so an exemption must be provided by state law, if at

4  all.[5]  Nevada exempts from the bankruptcy estate payments "received

5  as compensation for personal injury, not including compensation for

6  pain and suffering or actual pecuniary loss, by the judgment debtor

7  . . . ."  Nᴇᴠ. Rᴇᴠ. Sᴛᴀᴛ. § 21.090(1)(u).  The statute caps the

8  amount of money that may be exempted from the estate at $16,150.

9  <u>Id.</u>

10

11  _____

proceeds from such claims are property of the bankruptcy estate"); <u>In
12  re Bowker</u>, 245 B.R. 192, 194 (Bankr. D.N.J. 2000) ("The estate
contains both the tangible and intangible property of the debtor,
13  including causes of actions"); <u>In re Ballard</u>, 238 B.R. 610, 624
(Bankr. M.D. La. 1999) ("The pre-petition note — or cause of action
14  — is property of the estate"); <u>In re Stinson</u>, 221 B.R. 726, 729
(Bankr. E.D. Mich. 1998) ("The estate includes the debtor's personal
15  injury claims"); <u>In re Maroney</u>, 195 B.R. 452, 455 (Bankr. D. Ariz.
1996) ("the personal injury claim that resulted in the judgment became
16  property of the estate (to the extent of the Debtor's interest in it)
and remains so today since it was not scheduled as an asset of the
17  estate"); <u>Matter of Young</u>, 93 B.R. 590, 593 (Bankr. S.D. Ohio 1988)
("the proceeds from the settlement of the debtors' personal injury
18  claims are property of this bankruptcy estate"); <u>In re De Berry</u>, 59
B.R. 891, 895 (Bankr. E.D.N.Y. 1986) ("The personal injury action and
19  any proceeds realizable therefrom constituted an interest in property
held by the Debtor at the commencement of the case and was accordingly
20  property of the estate"); <u>In re Geis</u>, 66 B.R. 563, 564 (Bankr. N.D.
Ga. 1986) ("the definition in Code § 541(a) is broad enough to include
21  an unliquidated personal injury claim"); <u>In re Mills</u>, 46 B.R. 525, 526
(Bankr. S.D. Fla. 1985) (finding "no basis under Florida law to exempt
22  this debtor's cause of action for personal injuries from the claims
of creditors or from the property of this bankrupt estate").

23

[5]Nevada Revised Statute § 21.090(3) provides that "any exemptions
24  specified in subsection (d) of § 522 of the Bankruptcy Act of 1978,
11 U.S.C. § 522(d), do not apply to property owned by a resident of
25  this State unless conferred also by [Nevada law]".  States that have
not opted out of the federal system allow their debtors to choose
26  whether to take the state or federal exemptions.  A debtor may then
take either the state or the federal exemptions, but may not pick and
27  choose between the two.  States that have opted out of the federal
system, such as Nevada, limit their citizens to exemptions available
28  under state (or federal non-bankruptcy) law.  <u>See generally</u>, 4 Cᴏʟʟɪᴇʀ
ᴏɴ Bᴀɴᴋʀᴜᴘᴛᴄʏ ¶¶ 522.01–522.02[1].

1   The Ninth Circuit Bankruptcy Appellate Panel has held that a

2   legal malpractice action may be a claim for personal injury if the

3   malpractice action "was spawned" from the personal injury claim.

4   Sylvester v. Hafif (In re Sylvester), 220 B.R. 89, 92 (B.A.P. 9th

5   Cir. 1998).  In Sylvester, the debtor had filed suit against his

6   former employer for harassment, retaliation, wrongful discharge,

7   and emotional distress.  Id. at 90.  The debtor and two other

8   plaintiffs settled their claims for $825,000, which included

9   attorneys' fees and costs.  Id.  After his expenses were paid, the

10  debtor received only $86,159 for his portion of the settlement.

11  Id.  Upset by this amount, the debtor commenced a malpractice suit

12  against his attorney.  Id.  Before resolution of the malpractice

13  action, however, the debtor filed for bankruptcy.  Id.  The debtor

14  sought to exempt his malpractice claim from the bankruptcy estate.

15  Id.  The bankruptcy court held that the malpractice claim was a

16  property claim and did not allow the exemption.  Id. at 91.  On

17  appeal, the Bankruptcy Appellate Panel reversed.  Id. at 93.

18  The Bankruptcy Appellate Panel looked beyond the face of the

19  malpractice action to determine the "character of the funds sought

20  to be recovered."  Id. at 92.  The panel found that the settlement

21  agreement was entered into in exchange for dismissing the debtor's

22  claims, which included a claim for emotional distress.  Id.  The

23  panel concluded that the portion of the funds attributable to the

24  emotional distress claim that the debtor eventually recovered were

25  exempt from the bankruptcy estate because an emotional distress

26  claim was a personal injury claim.  Id.  The portions of the funds

27  attributable to the remaining non-personal injury claims, however,

28  were not exempt.  Id.

The legal malpractice claim here does not seem to be spawned from an underlying personal injury claim as to the Suters.[6]  The phrase "personal injury" in general refers to any harm caused to a person, such as a broken bone, a cut, or a bruise.  In other words, the claim involves bodily injury.  See Haaland v. Corp. Mgmt., Inc., 172 B.R. 74, 77 (S.D. Cal. 1989) (interpreting the California personal injury exemption statute and concluding that "the legislature contemplated bodily injury rather than other types of injury such as loss of property"); In re Keyworth, 47 B.R. 966, 972 (D. Colo. 1985) (finding "personal injuries" encompassed at least "bodily injuries").  A broader reading of "personal injury" could also include "[a]ny invasion of a personal right, including mental suffering and false imprisonment."  See BLACK'S LAW DICTIONARY (8th ed. 2004).  The common thread between the definitions is that there is some harm or damage to one's person.

Here, the Suters suffered no harm to their persons.  The Suters' original state lawsuit had claims for breach of contract, fraud, false imprisonment, civil assault, battery, medical malpractice, intentional and negligent infliction of emotional distress, and conspiracy.  But all of their personal injury claims stem from the alleged treatment that their daughter received from her treating physicians.  While the allegations are certainly atrocious, they do not contemplate injuries to the Suters' own bodies.  Thus, the personal injury exemption provides them no succor; the claim is property of the estate and not exempt.

---

[6]Again, only Horace and Barbara Suter are involved here; their daughter's claims are separate.

The Suters counter that some pre-petition claims may be exempted from property of the estate.  (Appellants' Response to Court's Order Dated February 15, 2008, ("Appellants' Response") at 5 (#37) citing Bell v. Bell (In re Bell), 225 F.3d 203, 216 (2d Cir. 2000).)  Bell, however, is not as persuasive as the Suters asseverate.

In Bell, a debtor filed for Chapter 11 bankruptcy protection.  225 F.3d at 207.  More than 30 days after the initial meeting of the creditors, the debtor then converted his case to Chapter 7.  Id.  Following the conversion, the Chapter 7 trustee filed an objection to some assets that the debtor had previously claimed as exempt.  Id.  The bankruptcy court upheld the objection, rejecting the debtor's argument that because the objection had not been filed within 30 days of the Chapter 11 meeting of the creditors, the objection was untimely.  Id.  The district court affirmed, but the Second Circuit reversed.  Id.  The Second Circuit held that once property is listed as exempt, if no objections are timely filed, the property remains exempt.  Id. at 215.

As such, Bell does not stand for the proposition that pre-petition personal injury claims are not property of the estate.  Instead, it stands for the proposition that absent a timely objection, property claimed as exempt is exempt and re-vested in the debtor.  It follows that if a debtor lists a pre-petition personal injury claim on his or her schedule of assets, but claims an exemption for that asset, if the trustee does not object to the exemption, the asset will be exempt.

The legal malpractice action here does not rest on an underlying personal injury claim as to the Suters.  The Suters did

not claim an exemption for the lawsuit, regardless of how it is characterized.  Therefore, the personal injury exemption does not apply to the case at hand.

### 3. There Is No Sufficient Public Policy Reason To Exclude the Malpractice Action from the Bankruptcy Estate

The Suters argue that the malpractice action is "so personal" as to them that the asset should not be property of the estate on public policy grounds.  See Sierra Switchboard, 789 F.2d at 709 n.3.

In Sierra Switchboard, the debtor, a principal of a company, was involved in litigation with another company.  Sierra Switchboard, 789 F.2d at 706.  Both the debtor and her company were parties to the dispute as she had personally guaranteed her company's debts.  Id.  In the course of that litigation, and before filing for bankruptcy, the debtor asserted a cross-claim against the other company for emotional distress.  Id.  The debtor then filed for bankruptcy.  The bankruptcy court determined that the debtor's emotional distress claim was property of the estate, and if the debtor attempted to assert the claim in state court, she would lack capacity to sue.  Id.  The debtor appealed, and the district court affirmed.  Id.

On appeal to the Ninth Circuit, the court held that all property, even exempt property, is initially property of the estate.  Id. at 708.  The court continued that "regardless of whether a personal injury claim is transferable or assignable under state law, such claims become part of the bankruptcy estate under

15

section 541." Id. at 709.[7]  Thus, the emotional distress claim was property of the estate.

The Ninth Circuit's opinion, however, was not without caution: the court noted that it "need not decide whether emotional distress might in some circumstances be so personal to the debtor that it would be undesirable, on public policy grounds, to transfer the property interest to the bankruptcy trustee.  In the circumstances of this case, we perceive no persuasive public policy rationale." 789 F.2d at 709 n.3 (internal citation omitted).

Sierra Switchboard provides only limited guidance in determining whether a claim is so personal to the debtor that it should be excluded from the bankruptcy estate.  The parties did not cite, nor have we discovered, any authority to support the idea that a legal malpractice claim is so personal that it would not become part of the bankruptcy estate.

The Court can envision three related reasons for finding an action to be so personal as to exclude it from the bankruptcy estate: (1) permitting the debtor to prosecute intimately personal claims serves as a type of catharsis for the debtor; (2) it seems unfair to allow a defendant to "buy" his or her own wrong and to keep it from public scrutiny; and (3) compensation for personal

---

[7]Previously, property that could not be transferred under state law was exempt from property of the bankruptcy estate.  Thus, prior to Sierra Switchboard, the Suters' claim likely would have been exempt from the bankruptcy estate.  See Achrem v. Expressway Plaza Ltd. P'ship, 917 P.2d 447, 449 (Nev. 1996) (an assignment of a tort claim is invalid where it "assigns to a third party the right of an injured plaintiff to recover against a tortfeasor. . . .  We conclude that . . . a meaningful legal distinction exists between assigning the rights to a tort action and assigning the proceeds from such an action.").  Now, however, the state law transferable/non-transferable distinction does not matter.  Sierra Switchboard, 789 F.2d at 709.

injury claims are intended to make a plaintiff whole, not merely to pay off a debt.

Each of these reasons stems from righting a wrong done to a plaintiff herself.  As the court wrote in <u>Sierra Switchboard</u>, the claim must be "personal," that is, it must belong to the plaintiff. We do not find that the present case is such a circumstance.  As noted above, the Suters seek to recover for harm that stems from the personal injury of another.  In that limited sense, the claim is not personal as to them.  While the allegations giving rise to the underlying dispute here are tragic, the purpose of § 541 is to create objectively an estate for the trustee in bankruptcy to administer.  <u>See</u> <u>Sierra Switchboard</u>, 789 F.2d at 709 & n.2 (noting changes in the bankruptcy law were designed to simplify the determination of what constituted property of the estate).

Lawsuits are property of the estate unless claimed as an exemption.  The Suters listed the lawsuit as an asset on their bankruptcy schedules and have not tried to claim an exemption for it.  The legal malpractice action is property of the estate.

**B. Whether the Bankruptcy Court Abused Its Discretion in Confirming the Sale or Compromise of the Legal Malpractice Action**

The Suters argue that it was an abuse of discretion for the bankruptcy court to approve the transaction between the trustee and the Goedert firm because it is contrary to law to sell a cause of action to the defendants in that cause of action.  We disagree. Because the legal malpractice action is property of the estate, the trustee had the authority to sell, settle, or compromise non-exempt assets of the estate.  <u>See</u> 11 U.S.C. § 363; Fed R. Bankr. Pro. 9019.

17

Further, the trustee here settled or compromised the claim with the Goedert firm, it did not sell it.

### 1. Sell, Compromise, and Settle

The parties make an issue out of whether the trustee "sold" or "compromised" the malpractice lawsuit.  The bankruptcy court looked at the situation as one where the trustee had two offers to compromise, one from the Suters and one from the Goedert firm, and the trustee accepted the Goedert offer because it was in the best interest of the estate.  The bankruptcy court disavowed the notion that it was approving a sale.

Settlements or compromises are favored in bankruptcy. Marandas v. Bishop (In re Sassalos), 160 B.R. 646, 653 (D. Or. 1993).  Indeed, "[i]t is an unusual case . . . in which there is not some litigation between the representative of the estate and an adverse party.  Much of that litigation is settled."  10 COLLIER ON BANKRUPTCY ¶ 9019.01.

We find that the trustee compromised or settled the claim, she did not sell the claim to the Goedert firm.[8]  The trustee had three options: (1) she could sell control of the lawsuit back to the Suters; (2) she could prosecute the claim herself for the estate; or (3) she could settle or compromise the claim with the Goedert firm.  The Goedert firm was not a stranger to the litigation: the attorneys were the defendants in the underlying action.  The Goedert firm, as the defendants, offered a sum of money to the

---

[8]At oral argument, counsel for the Goedert firm conceded that if the transaction were a "sale" of the lawsuit to the defendants, such a transaction would be void.

plaintiff — here, the trustee — in the action.  The trustee

accepted the offer after determining that it was in the best

interest of the estate.  Thus, the transaction was an agreement — a

settlement — between two parties involved in a lawsuit.

The Suters advance the argument that they only offered to

settle the case with the trustee, but not with the defendants.

That is, the Suters contend that they offered to pay $10,000 for

the right to keep their interest in the underlying lawsuit, which

would only have value to the trustee if the bankruptcy court

determined that the lawsuit was property of the estate.  The

trustee would then abandon her rights to pursue the underlying

litigation.  The Suters argue that what was before the bankruptcy

court was a "motion to compromise the asset by transferring it to

the debtors."  (Appellant's Opening Brief at 6 (#47).)

We do not find the Suters' characterization of the transaction

persuasive.  The better interpretation seems to be that the Suters

knew that there would be competing offers for control of the claim,

and the trustee would have to choose either to sell the asset back

to the Suters or compromise the claim with the Goedert firm.

The Suters' motion to compromise provided that the trustee

would compromise the claim with the Suters for "ten thousand

dollars or for such other greater amount that may be offered" at a

hearing on the matter.  (See Motion and Notice for Order

Authorizing the Release of the Estate's Interest in a Personal

Litigation Suit, Tab A, Ex. A, Appellees' Brief (#38) (emphasis

added).)  The Suters, then, may not have thought that anyone else

would actually make an offer for the compromise; however, they were

put on notice that other offers may be accepted at the hearing.  In

fact, there is evidence in the record that the Suters knew that representatives from the Goedert firm would be present at the hearing.  Even if the trustee had told the Suters that their offer would be the only one accepted, this would not have been a sufficient basis on which to rely.  See Goodwin v. Mickey Thompson Entm't Group (In re Mickey Thompson), 292 B.R. 415, 421 (9th Cir. B.A.P. 2003) ("a trustee's fiduciary duty to maximize the assets of the estate trumps any contractual obligation that a trustee arguably may incur in the course of making an agreement that is not enforceable unless it is approved by the court").

We conclude that the trustee was faced with two competing offers for the claim: she could either sell the claim back to the Suters or compromise the claim with the Goedert firm.  She chose to accept the Goedert firm's offer.  This Court, then, must determine whether the bankruptcy court abused its discretion in approving the Goedert firm's offer to compromise.

### 2. The Bankruptcy Court's Test for Approving a Compromise

Contrary to the Suters' arguments, both the trustee and the bankruptcy court went through the appropriate cost-benefit analysis required to determine whether a compromise should be approved.  The trustee must examine the following factors to determine whether to approve a compromise: (1) the probability of success in the litigation; (2) the difficulty in collection, if any; (3) the complexity of the legal issues that are involved; and (4) the paramount interest of the creditors.  In re A&C Props., 784 F.2d 1377, 1381 (9th Cir. 1986).  Further, "[w]hen assessing a compromise, courts need not rule upon disputed facts and questions

of law, but only canvass the issues." <u>Burton v. Ulrich (In re</u>
<u>Schmitt)</u>, 215 B.R. 417, 423 (9th B.A.P. 1997).  If the court were
required to do more than canvass the issue, "there would be no
point in compromising; the parties might as well go ahead and try
the case."  10 COLLIER ON BANKRUPTCY ¶ 9019.02.

Here, the trustee, in her motion filed with the court,
analyzed her position under the <u>A&C Properties</u> test.  (<u>See</u> Tab A,
Ex. A of Appellees' Brief of March 3, 2008 (#38).)  The trustee
determined that there would be a low probability of success in the
litigation in light of the defendants' success at the state
district court level.  Further, the trustee reasoned that
collection of funds, while not difficult, would likely not occur
until after a long delay.  As such, she thought it would be best to
settle the claim.  Last, the trustee stated that she thought it
would be in the best interest of the creditors if the compromise
were approved.

In its decision of the case, the bankruptcy court likewise
followed the <u>A&C Properties</u> factors.  The bankruptcy court listed
the difficulties the Suters would have in prevailing first at the
Nevada Supreme Court level and then at the trial level.  The
bankruptcy court also noted the likely delay in resolving the
dispute.  The bankruptcy court did not attempt to enumerate the
Suters' chance of success with the claim, but reasoned that the
claim involved complex issues that faced significant procedural and
substantive hurdles.  The bankruptcy court also determined that any
collection could take "years and years and years." (<u>See</u> Bankr. Ct.
Hearing Trans. April 14, 2004, at 17-18, 29-32, 36, 65-67.)

It appears that the bankruptcy court and the trustee examined all of the appropriate factors in determining whether or not to approve a compromise.  As such, it does not appear that the bankruptcy court abused its discretion.

The Suters, however, argue that the bankruptcy court actually approved the "sale" of the asset, and not a "compromise" of the asset.  Even though we reject the Suters' contention, we note that the bankruptcy court's decision is in concert with the Bankruptcy Appellate Panel's view that a bankruptcy court may approve the "sale" of a cause of action, even if it does so under the auspices of a "compromise."  In re Mickey Thompson, 282 B.R. at 421.[9]

In Mickey Thompson, a trustee agreed to "compromise" several claims for fraudulent conveyances with the parties who allegedly engaged in the conveyances for $40,000.  Id. at 418.  A creditor of the estate objected, and, after the trustee had already accepted the first compromise, offered to pay the trustee $45,000 plus a certain percentage of any future recovery as a result of the causes of action.  Id.  The trustee agreed to renege on his agreement with the first parties and openly solicited offers from other bidders.  Id. at 418-19.  When the time for a hearing on the matter came, the trustee decided that he was bound to accept the original offer.  Id. at 419.  The creditor objected, the bankruptcy court approved the first compromise, and the creditor appealed.  Id.

---

[9]See, e.g., Keenan v. Pyle (In re Keenan), 43 Fed. Appx. 1 (9th Cir. Feb. 27, 2002) (unpublished) (finding that a trustee's "fair" settlement of a legal malpractice action with the defendant in the action was not contrary to California law, even though California law prohibits the sale of legal malpractice actions to third parties).  Keenan is not precedential authority, and we do not rely on it as such; it is merely illustrative.

On appeal, the Bankruptcy Appellate Panel determined that the settlement was actually a sale of an asset, not a compromise, as the settling parties (the first parties) had no claims of their own to release.  Id. at 421.  The Panel held that "the disposition by way of a 'compromise' of a claim that is an asset of the estate is the equivalent of a sale of the intangible property represented by the claim, which transaction simultaneously implicates the 'sale' provisions under section 363 as implemented by Rule 6004 and the 'compromise' procedure of Rule 9019(a)."  Id.  The court recognized that "the consideration that [flows] to the estate from [a] . . . 'compromise' of the cause of action . . . also functions as a 'price' in a sale."  Id. at 422.  Further, the appellate panel reasoned that when "confronted with a motion to approve a settlement under Rule 9019(a), a bankruptcy court is obliged to consider, as part of the 'fair and equitable' analysis, whether any property of the estate that would be disposed of in connection with the settlement might draw a higher price through a competitive process and be the proper subject of a section 363 sale."  Id. at 421-22.

In the present case, the question would be whether the trustee complied with the sale and compromise procedures.  For a sale, timely notice must be given and a hearing may be necessary in some cases.  FED. R. BANKR. PRO. 2002(a)(2) (requiring 20 days' notice of a proposed sale); 6004(a).  Objections to a proposed sale must be filed and served at least five days before the date for the hearing.  FED. R. BANKR. PRO. 6004(b).  If an objection is filed, the bankruptcy court may hold a hearing on the matter.  FED. R. BANKR. PRO. 6004(e).  If the sale is not in the ordinary course of

business, the trustee may sell the asset privately or by public auction.  FED. R. BANKR. PRO. 6004(f).  For a compromise, Rule 9019 permits a court, on motion by the trustee and after 20 days' notice and a hearing, to approve a compromise or settlement.  FED. R. BANKR. PRO. 9019(a); 2002(a)(3).  The key requirements for both a sale and a compromise are that notice be given and that a hearing be held if necessary.[10]

These requirements were met.  The trustee filed her motion to approve the compromise on February 18, 2004, with a hearing set for April 14, 2004.  This is a period of greater than 20 days, and there was a hearing on the matter.  The bankruptcy court's ruling was not contrary to law.

### 3. Compromise of the Action and Public Policy

The Suters last argue that the compromise violated public policy.  To the Suters, the defendant in a malpractice action should not be able to obtain the right to prosecute the underlying cause of action.  We conclude that the Suters had adequate notice of the defendants' actions; further, the compromise was a fair settlement for the trustee.  Therefore, the transaction did not violate public policy.

First, as noted above, the Suters had inquiry notice, if not actual notice, of the potential compromise between the trustee and

---

[10]See also Grupo Xtra of N.Y., Inc. v. Golden (In re Grupo Xtra of N.Y., Inc.), Nos. 04-55199, 04-552200, 04-55201, 04-55267, 04-55269, 04-55271, 2006 WL 378721, 2006 U.S. App. LEXIS 3876 (9th Cir. Feb. 16, 2006) (unpublished) ("irrespective of whether [the transfer of an underlying cause of action] was a compromise settlement or a sale, . . . the notice requirements were the same").

1   the Goedert firm.  The Suters, then, cannot claim any type of
2   unfair surprise by the trustee's actions.[11]

3       Second, the compromise was fair in that it maximized the
4   assets of the bankruptcy estate.  The trustee compromised the claim
5   for an amount greater than that which the Suters offered.  We
6   recognize that throughout this process the Goedert firm had the
7   financial advantage.  The "value" of the lawsuit to the Goedert
8   firm, from an economic perspective, is equal to the probability of
9   losing the lawsuit multiplied by the likely value of any adverse
10  judgment.  For example, if the chance of losing the lawsuit was
11  only five percent (that is, a 95 percent chance of success), but
12  the potential adverse judgment was $1 million, it would be in the
13  Goedert firm's economic self-interest to offer up to $50,000 for
14  the lawsuit.

15      The Suters face a similar economic consideration, but also
16  have some non-economic interest in having their day in court or in
17  seeing the Goedert firm potentially condemned in a public trial.
18  The Suters, however, are hamstrung by their lack of resources; they
19  are, after all, in bankruptcy proceedings.  The economics of the
20  situation greatly favor the Goedert firm.

21      Even with this consideration, it is unlikely the trustee could
22  have received a greater amount for the claim in any other way.  The
23  Suters offered $10,000 for the claim.  Presumably, they thought
24  that their offer was a fair settlement with the trustee.  The

25

26          [11]The Nevada Supreme Court also seems to have given its tacit
    approval of the compromise when it approved the dismissal of the
27  Suters' state cause of action based on the stipulation of the trustee
    and the Goedert firm.  Had the Court seen a problem with the dismissal
28  of the state appeal on account of the compromise, presumably the Court
    would not have approved of the dismissal.

Goedert firm's offer represented a 50 percent premium over the Suters' offer if no appeal was taken, or a 25 percent premium over that amount if an appeal was taken.  Mathematically, the compromise seems to be the best deal available for the estate.

Moreover, the Suters do not argue that the Goedert firm's offer was too low.  They instead argue that they should not be denied their day in court to air their grievances.  While we are sensitive to the Suters' plight, they forfeited that right when they declared bankruptcy.  In exchange for bankruptcy protection, the Suters surrendered their capacity to prosecute their malpractice action.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

## IV. Conclusion

The Suters' pre-petition legal malpractice action was property of the bankruptcy estate. Legal causes of action are property of the estate unless otherwise excluded or exempted. The Suters listed the lawsuit as an asset on their bankruptcy schedules, and they did not claim it as an exemption. Further, the Court finds no public policy reason to exclude the asset from the estate.

In light of this conclusion, the bankruptcy court did not abuse its discretion in confirming the compromise of the claim. The trustee had the authority to compromise the cause of action, subject to court approval, as part of the bankruptcy estate. The bankruptcy court applied the appropriate legal standard and determined that the Goedert compromise was in the best interest of the creditors.


Dated: October __16__ , 2008.

*Edward C. Reed.*
UNITED STATES DISTRICT JUDGE